ALBERT F. HAYDEN, assignee, *vs.* JAMES F. SHAW. & others.

Suffolk.    March 14, 15, 1906. — May 16, 1906.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Contract,* Construction.  *Evidence,* Extrinsic affecting writings.

In an action for the alleged breach of a contract in writing, it appeared that by the contract the defendants agreed to buy certain bonds, constituting the majority of an issue, from the plaintiff's assignor at a price named, and that these bonds were bought and paid for by the defendants in accordance with the terms of the contract. The plaintiff contended that by the true construction of the contract the defendants also were bound to buy other outstanding bonds and certain stocks named in the contract, or to foreclose the mortgage securing the first named bonds, or to bid $100,000 when the mortgage was foreclosed, and also when the mortgage was foreclosed to pay the plaintiff's assignor $10,000 less foreclosure expenses. The defendants did none of these things, but sold the bonds which they had purchased under the contract to a third person, a purchaser from whom foreclosed the mortgage and bid in the property for $1,000. The contract, although it provided what should be done in case the defendants bought the outstanding bonds and stocks named or in case they foreclosed the mortgage, contained no agreement on their part to do either of these things, and the agreements of the defendants to bid $100,000 when the mortgage was foreclosed and to pay the plaintiff $10,000 less expenses were shown by the language of the contract to refer only to a foreclosure by the defendants in case they elected to foreclose. *Held,* that the presiding justice was right in ordering a verdict for the defendants.

An oral agreement afterwards changed and made part of a contract in writing is not admissible in evidence, or if proved has no effect. Here there was an express provision that all understandings and agreements between the parties so far as they were in conflict with the contract in writing should have no further force and effect.

CONTRACT by the assignee of one Tennis for the alleged breach of a contract in writing between the defendants and Tennis and also for the alleged breach of an oral agreement, as stated in the opinion. Writ in the Supreme Judicial Court dated December 15, 1903.

The case was tried before *Barker*, J., who at the close of the evidence ordered a verdict for the defendants. Mr. Justice Barker having died while the allowance of exceptions alleged by the plaintiff was pending, the exceptions afterwards were allowed under R. L. c. 173, § 108, by *Braley*, J.

*C. F. Choate, Jr.*, (*G. D. Burrage* with him,) for the plaintiff.

*G. W. Cox & F. S. Katzenbach, Jr.*, (of New Jersey,) for the defendants.

LORING, J. This is an action brought by the plaintiff as assignee of one Tennis for the breach of a contract between Tennis and the defendants James F. Shaw and Company (a firm engaged in promoting and building street railways) and E. H. Gay and Company (bankers, dealing in street railway securities).

In August, 1900, Tennis was the owner of one hundred and twenty-six (being a majority of the total issue of two hundred and fifty) mortgage bonds of the Philadelphia and Bristol Passenger Railway Company, subject to certain debts for which they were pledged. By an agreement in writing dated August 13, 1900, Tennis agreed to sell and the defendants agreed to buy these one hundred and twenty-six bonds for forty cents on the dollar, and any further bonds that might be deposited, up to one hundred and fifty-four bonds.

The plaintiff's contention is (first) that by the true construction of this written contract the defendants were bound to buy the other outstanding bonds and certain stocks hereinafter referred to, or to foreclose the mortgage, or to bid $100,000 when the mortgage was foreclosed, and also when the mortgage was foreclosed to pay Tennis $10,000 or $10,000 less foreclosure expenses; and (second) if this is not so, that by an oral agreement made by the defendants in consideration of Tennis's entering into the written contract they were bound to buy in the outstanding bonds and the stocks already referred to or foreclose the mortgage, and on the defendants doing one or the other they were bound by the written contract to pay the plaintiff his $10,000, and to bid $100,000 at the foreclosure sale.

It is admitted that the defendants paid for the one hundred and twenty-six bonds, and in addition bought seventeen bonds which were deposited under the agreement in question, but did

nothing further. They did not buy in the other bonds nor the stocks nor foreclose the mortgage, but sold their one hundred and forty-three bonds in February, 1901, to one Johnson and the Lehigh Valley Traction Company. It is admitted that Johnson and the traction company sold to one Fell, and that Fell (who previously had bought eighty-four bonds of one Morrell whose holdings and relations to the matter are hereinafter set forth in full) sold his two hundred and twenty-seven bonds to J. L. Blackwell and Company, at whose instance the mortgage was foreclosed on September 10, 1901, and by whom the mortgaged property was bid in for $1,000.

One of the elements of damage claimed by the plaintiff was the loss on ten bonds belonging to him (which were mislaid or lost), on which he got his proportion of $1,000, the actual proceeds of the foreclosure sale, in place of his proportion of $100,000 which it is his contention should have been the proceeds of the foreclosure sale.

The plaintiff also contends that the defendants made a profit when they sold the bonds to Fell. This the defendants deny, and explain that they were sold with other property for a lump sum, and the profit was made on the other property.

The defendants contend that the only obligation which they took upon themselves by executing the written contract was to buy for forty cents on the dollar the one hundred and twenty-six bonds and all other bonds which should be deposited under the contract, and that they did so; that having bought these bonds they could do with them as they pleased; and further, as to the alleged oral agreement, that the conversation testified to was a part of the negotiations which led up to the written contract here sued on.

The defendants testified that they did not sell the bonds to Fell until they were told by Mr. Tennis's counsel that they "could not get any more bonds and . . . could not get the allied stocks." This was not contradicted.

In their arguments as to the true construction of the written contract of August 13, 1900, both the plaintiff and the defendants have appealed to the circumstances under which it was made. Before stating the terms of the contract, we shall state these circumstances.

Before July, 1900, Tennis had undertaken to build an electric street railway from the county line of Philadelphia to Bristol, a distance of eleven miles. The name of the railway was the Philadelphia and Bristol Passenger Railway, and for convenience we shall speak of it as the railway. The amount of the capital stock and of the issue of mortgage bonds was $250,000 each. The railway was to be constructed on the road of a turnpike company, which had by contract given the railway company a right to construct its railway on its road. The capital stock of the turnpike company was owned by one Morrell. Tennis had not been successful in building the railway. The permission granted by the turnpike company did not give him the right to build on the turnpike company's road if the abutters objected, and there was what was spoken of at the argument as " a gap " of three quarters of a mile where the abutters did object. To overcome that difficulty Tennis had organized a steam railroad, because a steam railroad had a right to condemn land while a street railway had not. This " gap " was seven miles north from the Philadelphia county line, i. e. from the southern terminus of the railway. To prevent a forfeiture of the three and a quarter miles north of the " gap," Tennis organized a horse railway, which operated this portion of the tracks under a lease from the railway company. The danger of a forfeiture of the three and one quarter miles north of the " gap " came from a law requiring the operation of a street railway to be continuous.

Tennis had been unsuccessful financially also. He had sold to Morrell eighty-four, had pledged to creditors one hundred and twenty-six, had lost or mislaid twelve, and otherwise had parted with the remaining twenty-eight of the two hundred and fifty mortgage bonds of the railway. He had sold to Morrell all the stock of the railway in question and also all the stock of the steam railroad and the horse railway.

Morrell had sold to Fell (who was afterwards the purchaser of the defendants' bonds from Johnson and the traction company to whom the defendants sold them, as we have already stated) all his holdings on July 6, 1900, the month before the contract here sued on was made; and Fell was then operating the railway for the seven miles north of the Philadelphia county line and south of the " gap " by electricity, and the horse railway for

the three and one quarter miles north of the " gap " by horse power.   The mortgage interest was four years overdue, but the trustee of the mortgage had not taken possession of the mortgaged property.

One other circumstance should be stated, namely, that in the May preceding the August in question Tennis had given to one Myrick and one Shaw (a partner of the firm of J. F. Shaw and Company, one of the two defendant firms in the action now before us) an agreement in writing to sell and deliver to them on or before August 1, 1900, at their option, the whole mortgage bond issue of the railway ($250,000 in amount), and all its capital stock; also all the stock of the turnpike company, the steam railroad company and of the horse railway company. The price to be paid for all these securities was $115,000, $15,000 of which was to be paid in cash and the balance in mortgage bonds of a new company not to exceed $20,000 a mile.   Tennis not having secured Morrell's eighty-four bonds and his holdings of stock in the railway and in the other companies, secured from Myrick and Shaw, on June 28, an extension of his contract to September 1.   The contract now in question was made after it was known that Morrell had sold or had gone through the form of a sale of all his holdings which, as we have said, was on or about July 6, 1900.

It appeared that the defendants in the action now before us were contemplating building a street railway from Trenton (which is ten miles north of Bristol, the northerly terminus of the Philadelphia and Bristol Railway, the railway in question) south to Philadelphia, and had been unsuccessful in getting a right of way.

Coming to the terms of the written contract of August 13, 1900:  It contained five articles.

Article one refers to a tripartite agreement of even date between the same parties and the Union Trust Company, whereby Tennis sells and the defendants in the case at bar buy one hundred and twenty-six bonds of the railway company at forty cents on the dollar, to be deposited with the trust company under the agreement; and the defendants in the case at bar also agree to buy at the same price any further bonds deposited thereunder up to one hundred and fifty-four bonds.

Article two provides that bonds up to $150,000 may be deposited under the agreement "before the foreclosure sale hereinafter mentioned," with a proviso that no part of the eighty-four bonds "recently held" by Morrell "shall be [so] deposited."

The third article is as follows: "It is understood and agreed that the mortgage securing the said bonds may be foreclosed when the parties of the second part * may elect, the expense thereof to be paid out of the sum of ten thousand dollars ($10,000) hereinafter mentioned, said foreclosure to be accomplished by the exercise of the power of sale contained in the said mortgage, or by a bill in equity, or otherwise, as the parties of the second part shall determine."

The fourth article begins with the statement that "The agreed price to be paid by the parties of the second part to the said Tennis for all of the said two hundred and fifty thousand dollars ($250,000) of bonds, with all unpaid coupons attached, and the stocks of the allied companies held with the eighty-four thousand dollars ($84,000) of the said bonds which were recently owned and held by Edward Morrell, is the sum of one hundred and ten thousand dollars ($110,000), that is, forty (40) cents on the dollar for the two hundred and fifty thousand dollars ($250,000) of bonds, making one hundred thousand dollars ($100,000) and an additional sum of ten thousand dollars ($10,000) to be reserved by the parties of the second part for the costs and expenses attending the foreclosure of the mortgage, the balance of said sum of ten thousand dollars ($10,000) after deducting said costs and expenses to be paid over to the said Tennis."

By "the stocks of the allied companies" it is conceded was meant the stocks of the electric railway company, the turnpike company, the steam railroad company, and the horse railway company.

It is then provided in the fourth article that if all the "$250,000 of bonds and the stocks of the allied companies" are acquired by the defendants in the case at bar "before the foreclosure sale," whether under the contract in question or by

---

* The defendants.

purchase directly from the owners, the defendants are to pay " the balance of agreed purchase price " of $110,000, to wit, the sum of $10,000 " less the aforesaid costs and expenses," to Tennis. Further, if by private purchase any bonds not covered by the agreement are bought " at less than forty (40) cents on the dollar for the said bonds, including with the aforesaid eighty-four thousand dollars ($84,000) of Morrell bonds the stocks of the allied companies," by Tennis or the defendants, the saving shall be divided between them.

The rest of the fourth article is in these words: "If, however, all of the said two hundred and fifty thousand dollars ($250,000) of bonds and stocks of allied companies should not be acquired by the parties of the second part before the said foreclosure sale and said sale takes place and at the said sale the property is purchased by the parties of the second part, or in their interest, the necessary costs and expenses as aforesaid shall be first deducted out of the aforesaid sum of ten thousand dollars ($10,000) and the balance thereof, less the costs and expenses as above provided, shall be paid over to the said Tennis or to his attorney. This will leave in the hands of the said parties of the second part, out of the aforesaid agreed price of one hundred and ten thousand dollars ($110,000), a sum equal to forty per cent (40%) of the par value of the bonds not acquired by the parties of the second part, which said sum shall be used to pay the pro rata shares of the purchase price at said sale to which the holders of the outstanding bonds may be entitled. If at the said foreclosure sale the property is purchased by the parties of the second part or in their interest, at a figure which will yield less than forty (40) cents on the dollar to the out-standing bonds, and a part of the agreed price of one hundred and ten thousand dollars ($110,000) is thereby saved, the amount of said saving shall be equally divided between the parties of the second part and the said Tennis excepting only the saving on the twelve thousand dollars ($12,000) of bonds which appear to have been lost. The total amount of saving on the said twelve thousand dollars ($12,000) of bonds shall be paid over to the said Tennis. At the said foreclosure sale the parties of the second part agree to buy in the property at the smallest price possible, and further agree that they will not allow any other

bidder to buy in the same at less than one hundred thousand dollars ($100,000)."

The fifth article is as follows: "All options, understandings and agreements between the parties hereto, so far as they conflict herewith, are of no further force and effect."

We now come to the construction of this written contract and particularly of the fourth paragraph. That paragraph after providing that $110,000 shall be the agreed price for all outstanding bonds "and the stocks of the allied companies held" with the $84,000 of bonds recently owned and held by Morrell, provides for three contingencies, namely (1) the acquisition of the bonds and allied stocks by the defendants before foreclosure; (2) the defendants becoming the purchasers at "said" foreclosure sale; and (3) a covenant to bid $100,000 "at the said foreclosure sale."

The plaintiff's argument is in substance that although the defendants have not in terms so agreed, they are to be held as matter of construction to have covenanted that one of these three contingencies should take place.

Their first argument in support of this contention is that the $110,000 was to pay for the securities named (all the bonds and the capital stock of all four companies) or, what is the same thing, the property which the defendants could get by foreclosing the mortgage. The facts dispose of that argument. The foreclosure would not have given the property or property rights which the stock of the turnpike company, the stock of the steam railroad company, and the stock of the horse railway company would have given. A foreclosure of the mortgage would not have given a purchaser the power of dealing with the "gap" which ownership in the stock of the steam railroad gave. Apparently it would not have given any right of way at any point; for Tennis testified that "the Philadelphia and Bristol Passenger Railway Company simply had a contract" with the turnpike company; that "the Philadelphia and Bristol Passenger Railway Company only had the right of way to build from the turnpike company and never made any claim to include that in its mortgage." Lastly, not only would it not give the right to operate the three and one quarter miles north of the "gap" which the horse railway company had, but apparently it was a

question whether the foreclosure would give to the purchaser any right to these three and one quarter miles of track. Fell, who bought Morrell's holdings, testified "that no property described in that mortgage is located on that part of the right of way between a point three quarters of a mile north of Neshaminy Creek in [and] Bristol." Neshaminy Creek was the beginning of the "gap." There evidently has been a mistake in transcribing this testimony. But Tennis's attorney wrote to the defendant Shaw on November 5, 1900 : "You have had an independent opinion from Messrs. Alexander and Magill advising you that the mortgage is a valid lien upon the Bristol end of the line and I feel quite sure that this is the case, although it may take some litigation before the question is finally determined." We assume that this refers to the matter testified to by Fell, and that the word "in" was a misprint for "and."

The plaintiff's next argument is (1) that the parties were to share in any saving on the price of forty cents on a dollar for the bonds, if there was a saving on that price by the defendants getting the property at "said" foreclosure; and (2) that if the defendants' construction had been the intention of the parties to the contract of August 13, they would have restricted the clause as to bidding $100,000 on foreclosure to "a sale held in their interest" in place of "at the said foreclosure sale."

Dealing first with the argument based on the terms of the agreement as to Tennis and the defendants sharing equally in the saving (if there turned out to be a saving) in the price of forty cents on the dollar for the bonds by foreclosing the mortgage : The first paragraph of article four had made it plain that the $110,000 was the "agreed price" not of the bonds alone but of the two hundred and fifty bonds "and the stocks of the allied companies held with the eighty-four thousand dollars ($84,000) of the said bonds which were recently owned and held by Edward Morrell." And in the second paragraph of article four (providing for sharing in a similar saving on the price of forty cents on the dollar for the bonds, if they were all of them bought and some of them directly from the holders in place of being deposited under the agreement), the provision is "at less than forty (40) cents on the dollar for the said bonds including with the aforesaid eighty-four thousand dollars ($84,000) of Morrell

bonds the stocks of the allied companies." By a foreclosure the defendants would not get these allied stocks. It seems to have been assumed that unless they got the allied stocks the defendants would not foreclose; in other words, to have been assumed that the Morrell bonds were not to be wiped out by the foreclosure; there was to be no foreclosure unless the Morrell bonds and allied stocks were bought; and the saving made by a foreclosure on the price of forty cents on the dollar for bonds could not apply to the Morrell bonds. It is for these reasons (in our opinion) that the contract in this connection was put in the words in which we find it.

The words " at the said foreclosure sale " relied on by the plaintiff in his argument are not altogether explicit, but it is hard to see what the word " said " refers to unless it be to a foreclosure sale under the third article, that is, a foreclosure sale instituted by the defendants. On the other hand it is hard to interpret " at the said foreclosure sale " to mean " at any foreclosure sale," and that is what the plaintiff in effect asks us to do.

The plaintiff's next argument is that although it is conceivable that Tennis might have parted with the control which a majority of the bonds gave him, it would have been a foolish contract for him to make, unless the defendants bound themselves to proceed to the foreclosure or to buy in the allied stocks; for unless they did come under such an obligation they were at liberty to sell at a profit, as they did, leaving the plaintiff to whistle for his $10,000 and the " other payments for which he stipulated."

Whether it was a foolish contract for Tennis to sell his one hundred and twenty-six bonds for forty cents on the dollar without procuring an obligation from the defendants to do one of three things, namely, (1) buy in the outstanding bonds and allied stocks, or (2) foreclose the mortgage, or (3) bid $100,000 if some one else foreclosed it, we have no means of knowing beyond reading the contract which the parties signed in the light of the circumstances under which it was made. We find no words putting on the defendants an obligation to do one of these things unless it be in case of the third of the three alternatives. If we construe " at the said foreclosure sale " to mean " at any foreclosure sale," there was an obligation on the defendants to bid at the foreclosure sale which took place. But even then

there is nothing which can be construed to impose on the defendants the two other alternatives.

It is hard to see why the third article should have stated that the mortgage " may be foreclosed when the parties of the second part may elect " if it was intended that by executing the contract the parties of the second part should come under an obligation to the plaintiff to foreclose it or to bid if some one else foreclosed it. And so of the insertion of the words " and said sale takes place," in the beginning of the last paragraph of the fourth article, namely, " If, however, all of the said two hundred and fifty thousand dollars ($250,000) of bonds and stocks of allied companies should not be acquired by the parties of the second part before the said foreclosure sale and said sale takes place and at the said sale the property is purchased by the parties of the second part, or in their interest."

On the contrary the language of the contract throughout is not only consistent but it recognizes that the foreclosure of the mortgage at the instance of the defendants is not compulsory.

Reading the contract in the light of the circumstances under which it was made, we are of opinion that it must be construed to be a sale of the one hundred and twenty-six bonds for forty cents on the dollar, with no obligation on the part of the defendants to buy the rest of the bonds and the allied stocks, but an agreement to share with Tennis any saving on the agreed price if they were acquired for less, with no agreement to foreclose the mortgage and to pay Tennis $10,000 on foreclosure, but an agreement that if they instituted a foreclosure under the third article and became the purchasers they would pay Tennis $10,000 less foreclosure expenses, and share with Tennis any saving on the price of forty cents on the dollar for bonds under the foreclosure sale; and finally, with the agreement to bid at a foreclosure which the defendants instituted under the third article of the contract. It is evident that the purpose of the defendants in thus restricting their obligation as to these matters was because unless they acquired the stocks held by Morrell they had no intention of foreclosing the mortgage; since in that event a foreclosure of the mortgage would not give them the right of way, which was what they wished to secure. The only conclusion to which we can come is that the defendants were willing

to buy the bonds for forty cents on the dollar and take the risk of that purchase. Beyond that they were not willing to bind themselves, but were willing, in case they decided to use the control given them by the bonds, to make the further payment of $10,000 less foreclosure expenses to share in the saving, if any, on the agreed price, and to secure to the plaintiff what would be secured to him by having the property bid in for at least $100,000.

It is perhaps worth while to add that it seems at least improbable that the defendants would agree to pay $110,000 for the bonds and allied stocks and assume the burden of an obligation to get in the allied stocks when the plaintiff had just given up as hopeless his contract to deliver to J. F. Shaw, one of the defendants, the same securities for $115,000.

This brings us to the plaintiff's contention that the jury were warranted in finding that the defendants orally agreed to buy the bonds and allied stocks or foreclose the mortgage in consideration of Tennis's executing the written contract.

When this was first testified to by Mr. Clark, who acted as Tennis's counsel in the matter, it appeared as if a promise to that effect was made contemporaneously with the execution of the written contract. But Mr. Clark in his cross-examination testified that the oral promise was not made when the contract of August 13 was executed, and that that part of the agreement was changed; and " for that part was substituted the parts relating to the foreclosure of this mortgage as contained in " the contract here sued on. This testimony therefore was testimony to negotiations which were later merged in the writing which was agreed to as the contract of the parties.*

In our opinion the presiding judge was right in directing the jury to return a verdict for the defendants.

*Exceptions overruled.*

---

* See the express provision of the fifth article of the contract which is printed on page 540.